52

NOT FOR PUBLICATION

**FILED**

JUL 28 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### (FRESNO DIVISION)

| | |
|---|---|
| In Re: | Case No. 08-13589-B-7 |
| Shawn Deitz, | Adv. No. 08-01217-B |
| Debtor. | TRIAL DATE:<br>APRIL 4,5,& 11 2011 |
| Wayne and Patricia Ford, | |
| Plaintiff, | DEPT.: "F", CT. RM. 13<br>JUDGE: RICHARD T. FORD |
| vs. | |
| Shawn Deitz, | |
| Defendant. | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### INTRODUCTION

1.    Shawn Deitz, the Debtor and Defendant in the above-captioned case ("Defendant"), filed a Voluntary Petition for relief under Chapter 7 of the United States Bankruptcy Code on June 20, 2008.

2.    The last day to file a complaint objecting to dischargeability of debts under 11 U.S.C. §§523(a)(2), (4) and (6)was September 22, 2008.  This Adversary Proceeding was filed September 19, 2008.

1

75

3. Plaintiffs, Wayne and Patricia Ford ("Plaintiffs"), timely filed a complaint to determine dischargeability of debt on September 19, 2008. Plaintiffs' Adversary Complaint alleges causes of action under 11 U.S.C. §§523(a)(2)(A), (a)(4), and (a)(6)[1].

4.   Trial occurred on April 4, 5 and 11, 2011 before the undersigned.   Thomas H. Armstrong, Esq. represented Plaintiffs.   Defendant appeared in pro se.   Prior to trial, the undersigned advised the parties that he is not related to or otherwise have any known connection to either Plaintiff despite having the same last name "Ford."

5.   The Court has considered significant documentary evidence, testimony of five (5) witnesses including each of the parties, assessed each witnesses' credibility, considered the argument set forth in the Plaintiffs' Trial Brief, Defendant's initial representations immediately prior to trial that he never intended to defraud or willfully injure Plaintiffs, and the proposed Findings of Fact and Conclusions of Law submitted by each party.

6.   After trial, and considering the above, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rules of Civil Procedure Rule 52(a)(1) as

**JURISDICTION**

7.   Jurisdiction exists under 28 U.S.C. §1334. Venue is proper under 28 U.S.C. §1409.   The District Court for

---

[1]   Unless otherwise stated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§101-1330.

2

the Eastern District of California has generally referred these
matters to the Bankruptcy Court for hearing pursuant to 28
U.S.C. §157(a) and United States District Court, Eastern
District of California General Orders 182 and 223.  This is a
core proceeding within the meaning of 28 U.S.C. §157(b)(2)(I).
This is a complaint objecting to the dischargeability of debt
under 11 U.S.C. §§523(a)(2)(A), (a)(4), & (a)(6).  Plaintiffs
are creditors of the estate and have standing to bring this
Adversary Proceeding.

**FINDINGS OF FACT**

8.     Defendant testified that he is currently employed
by Heald College on a part-time basis.  According to his
testimony, he served in the U.S. Marines for a number of years
and another branch of the armed forces.  His total service time
was 14 years.  During his time in the military, he was engaged
in construction projects.  Following his tenure in the military,
Defendant testified that he followed his passion for building
and became a general building contractor.  According to
Defendant's Contractors State License Board ("CSLB") Certificate
of Records (Plaintiffs' Exhibit "4"), Defendant's "B" General
Building Contractor's License was issued on September 10, 2004.
Defendant testified that he built a number of projects,
including a small tract of smaller homes, and that he
successfully completed some other larger custom homes in what
was identified as the "Applegate Project."  (Plaintiff's Ex.
"17", Deitz E-Mail September 9, 2007.)  The Applegate Project is
relevant in that it is where Plaintiffs and Defendant first met.

9.     Wayne Ford was born April 8, 1948 and is 63 years

old.  He is a disabled veteran.  He testified that he served in the U.S. Army as a combat infantry soldier beginning in 1967. He served in Viet Nam.  In June 1968, Mr. Ford was seriously injured when a vehicle in which he was a passenger ran over a land mine which detonated.  He suffered significant, permanent, and obvious disabilities resulting from the land mine blast and must walk with the assistance of fore-arm Canadian Crutches on both arms.  He will likely be confined to a wheelchair in the future.  Mr. Ford has no college education and has not worked since being injured.  He is permanently disabled.

10.  Mrs. Ford is a registered nurse.  She met her husband in a military hospital in Long Beach upon his return from Viet Nam.  They eventually married and she has cared for . him over the years.

11.  In 2006, Plaintiffs had house plans drawn and submitted to the County of Fresno for approval.  The plans were for a 4,170 square foot handicap accessible home to accommodate Mr. Ford's significant disabilities.  It was designed to comply with the Americans With Disabilities Act ("ADA"), the Veterans Administration ("VA") requirements for handicap assisted housing, and of course, the County of Fresno building code requirements.

12.  In late August or September 2006, Plaintiffs were driving around and by chance came upon the Applegate Project. Defendant was building three (3) custom homes at the Applegate Project.  Mr. Ford testified that he asked permission to look around the three (3) custom homes that were in various states of construction as they were similar in size to what he and his

4

wife were planning to build.  Defendant allowed Plaintiffs to
look at these homes.  Mr. Ford testified that each home had been
rough framed, was weather tight, and still in need of drywall
and finish carpentry.  Two (2) of the Applegate Project houses
had covered access porches, which is something Mr. Ford was
required to have in order to comply with ADA requirements and to
receive VA remuneration for handicap assisted housing.

13.   After Plaintiffs viewed the Applegate Project,
they spoke with Defendant regarding their plans to build a
handicap assisted home.  The undisputed testimony is that
Defendant represented that he was familiar with ADA and VA
requirements for handicap assisted housing and that he had, in
fact, built to these guidelines before.  Defendant represented
that he could build to these standards for Plaintiffs.

14.   The testimony by both Plaintiffs and Defendant
was that Defendant met Plaintiffs at their property where the
home was to be constructed on at least two (2) occasions.  The
unrefuted testimony adduced at trial was that during these
meetings with Defendant, that Defendant also brought commonality
between the parties relying on he and Mr. Ford's military
experiences, the fact that Defendant worked as a pharmacy tech
at the VA Hospital where Mr. Ford receives treatment, and that
Defendant's mother was or is a nurse similar to Mrs. Ford.  The
Plaintiffs each testified that they asked Defendant if he was a
licensed contractor in good standing and he replied that he was.
Plaintiffs did testify that they were aware of a bonding issue
that needed to be taken care of and that Defendant ultimately
represented to them that he obtained a bond so that issue was

1    resolved.   However, as the Court noted during trial, and as
2    Defendant admitted on direct examination, his license remained
3    suspended for other reasons at the time he contracted with
4    Plaintiffs.   The Court finds that Defendant's representations
5    about the status of his contractor's license was a knowingly
6    made material misrepresentation of fact and that Defendant's
7    conduct was designed with the specific intent to deceive
8    Plaintiffs, to fraudulently induce them to contract with him so
9    he could obtain the job and substantial payments of money from
10   Plaintiffs.

11          15.   At some point, presumably prior to September 25,
12   2006, Defendant was provided a set of plans that both he and Mr.
13   Ford initialed while the Plaintiffs' plans were in plan check
14   with the County of Fresno so Defendant could prepare a bid.
15   (Plaintiff's Exhibit "2".)

16          16.   On September 25, 2006 Defendant provided a Custom
17   Home Bid/Proposal to Plaintiffs. (Plaintiffs' Exhibit "1")   The
18   home's square footage was 4,170 square feet.   The total price
19   under the bid for the project was $444,105.00 or $106.50 per
20   square foot  (4,170 x $106.50 = $444,105.00).   According to
21   Defendant's bid, the project also included garage square footage
22   of 965 square feet, breeze-way square footage of 309 square
23   feet, porch and patio square footage of 1,136 square feet, and
24   the courtyard square footage of 470 for a total square footage
25   of 7,050 square feet for the project.   The bid indicated that it
26   included the cost to build and furnish the materials for the
27   home according to the plans as approved by the County of Fresno.
28   There was a caveat that extra flat-work, such as the driveway

6

and retaining wall, would be an additional charge, not included
in the $444,105.00 contract price.  In concluding the bid to
Plaintiffs, Defendant signed the letter "Thanks" and "Semper
fi".  At trial, and on direct examination of Defendant,
Defendant was provided a copy of the United States Marine Corps
website home page.  That home page was entered into evidence as
Plaintiff's Exhibit "22".  Plaintiffs' counsel had Defendant
read the following into the record from the United States Marine
Corps home page:

> "Semper Fidelis
> More Than a Motto, a Way of Life.
>
> *Semper Fidelis* distinguishes the Marine Corps bond
> from any other.  It goes beyond teamwork-it is a
> brotherhood and lasts for life.
>
> Latin for 'always faithful,' *Semper Fidelis* became the
> Marine Corps motto in 1883.  It guides Marines to
> remain faithful to the mission at hand, to each other,
> to the Corps and to country, no matter what.
>
> Becoming a Marine is a transformation that cannot be
> undone, and *Semper Fi* reminds us of that.  Once made,
> a Marine will forever live by the ethics and values of
> the Corps.

There is no such thing as an ex-Marine."
The Court finds that the use of "Semper Fi" in the September 25,
2006 bid was in furtherance of Defendant's intent to induce
Plaintiffs to contract with him for the construction of their
home.

17.    Following the initial bid of September 25, 2006,
a Proposal and Contract ("Contract") was drawn by Defendant
dated October 10, 2006.  (Plaintiffs' Exhibit "2" and
Defendant's Exhibit "A".)  The Contract contained the same total
price of $444,105.00 for the project.  The Contract bore

7

Defendant's California State Contractor's License Number 0846254.  Regarding Defendant's bonding issue mentioned above, the evidence demonstrated that Mr. Ford executed the Contract on November 7, 2006, one day after Defendant's license suspension for the contractor's bond issue was lifted.  (Plaintiffs Exhibit "4", a Certified Copy of Defendant's CSLB License History.)  However, Plaintiffs' Exhibit "4" demonstrates that Defendant's license was not reinstated until January 3, 2007 due to an outstanding judgment, for which a suspension was issued on October 12, 2006.  Defendant did offer evidence that he had paid this judgment.  Nonetheless, Defendant's license remained suspended at the time of contracting.  Mr. Ford testified that his only prior experience with a contractor was when he resided in Prescott, Arizona and that he had no problems with that remodel project.  The Court finds Mr. Ford's testimony credible and that he justifiably relied upon Defendant's representations that his license issue was resolved prior to executing the Contract.

   18.   The Court finds that Defendant executed the Contract on October 14, 2006, while his license was suspended in contravention of California Business and Professions Code §7028.5, which in pertinent part provides that, "It is unlawful for any person . . . to individually engage in the business or individually act in the capacity of a contractor without having a license in good standing."  The Court also finds that Defendant  failed to comply with the mandate of California Business and Professions Code §7030.1(a)&(b) requiring disclosure of Defendant's prior license suspensions as

8

Defendant's license was suspended three (3) times prior to submitting the Contract to Plaintiffs. California Business and Professions Code §7030.1(a)&(b) provides:

> "(a) A contractor, who has his or her license suspended or revoked two or more times within an eight-year period, shall disclose either in capital letters in 10-point roman boldface type or in contrasting red print in at least 8-point roman boldface type, in a document provided prior to entering into a contract to perform work on residential property with four or fewer units, any disciplinary license suspension, or license revocation during the last eight years resulting from any violation of this chapter by the contractor, whether or not the suspension or revocation was stayed.
> (b) The disclosure notice required by this section may be provided in a bid, estimate, or other document prior to entering into a contract."

The Court finds that Defendant offered no evidence that he complied with the mandate of California Business and Professions Code §7030.1(a)&(b). Plaintiffs offered no evidence of any such document presumably because they had none. Defendant's only disclosure relative to his license status was that it was in good standing with the exception of a bonding issue that he represented to Plaintiffs he had cured. The Court finds that this representation was material, false, intentional, and designed to induce Plaintiffs to contract with Defendant.

19. Included in the Contract was an attorney fees clause which provided:

> "In the event it becomes necessary to refer said proposal/contract to an attorney, the undersigned agrees to pay attorneys' fees and all costs incurred in the collection of the monies due under the proposal/contract."

While Defendant's Exhibit "A" (the "Contract") does not contain a "Notice to Owner", a "Notice to Owner" page was attached to Plaintiffs' Exhibit "2" (the "Contract"). The "Notice to Owner"

9

in part provides:

> "Under the California Mechanics' Lien Law, any contractor, subcontractor, laborer, supplier, or other person or entity who helps to improve your property, but is not paid for his or her work or supplies, has a right to place a lien on your home, land, or property where the work was performed and to sue you in court to obtain payment.

> This means that after a court hearing, your home, land and property could be sold by a court officer and the proceeds of the sale used to satisfy what you owe. This can happen **even if you have paid your contractor in full if the contractors, subcontractors, laborers, or suppliers remain unpaid.**"

20.   The Contract references the home was 4,170 square feet at $106.50 per square foot, consistent with the September 25, 2006 bid.   It further provides line item budgeted amounts for things such as termite pre-treat, foundation, framing, lumber, roofing, plumbing, plumbing fixtures, HVAC, electrical, electrical fixtures, drywall, finish carpentry, labor, cabinets, flooring, tile/counter tops, paint, stucco, garage doors, doors/moulding/trim, appliances, mirrors/shower doors, cleanup and trash.   The Contract refers to an Addendum which is set out as Defendant's Exhibit "A-4" that generally is an acknowledgment by Defendant and Plaintiffs of the ADA and VA requirements for a handicap assisted house.   It also includes a schedule of payments attached as Defendant's Exhibit "A-3" calling for payments beginning October 15, 2006 and continuing thereafter.

21.   The most comprehensive itemization of payments made, with corresponding receipt numbers, are set forth in Plaintiffs' Exhibit "8" showing payments made by Plaintiffs to Defendant corresponding with the line item allocations in the Contract.   Plaintiffs also provided Exhibit "9" which included

10

front and back copies of each negotiated check and corresponding receipts.   The total remuneration paid to Defendant was $511,795.00.   This includes a $6,500.00 credit given by Defendant to Plaintiffs as set forth in Receipt No. 722754 (Defendant's Ex. E-10; Plaintiffs' Ex. 9) for Plaintiffs' payment of $6,500.00 paid directly to Pacific Door by Mr. Ford, and a $4,100.00 payment paid by the VA for certain concrete work required by the VA. Defendant's Exhibit "D-4", which is a letter from Mr. Kennedy with the VA, indicates that the total amount paid to the builder was $511,795.00.

22.   Although the contract price was for $444,105.00, on or about June 27, 2007, a handwritten document entitled "Ford Budget" was submitted to Plaintiffs in the amount of $67,200.00. (Plaintiffs' Exhibit "3"; Defendant's Exhibit "A-5") The "Ford Budget" included amounts for roofing, fireplace, something that appears to be finish electric, cabinets, flooring, counter tops, tile, doors/trim, home theater, appliances, gutters, w/IT permit, an unreadable line item 13, utilities, stucco color and windows.   There is also a notation for showers for $6,500.00.   A number of these items were included in the original Contract line item schedule.   The evidence is that Plaintiffs paid $63,595.00 of the $67,200.00.   (Defendant's Exhibit "A-10a".) When the Court adds the $63,595.00 (which includes the $6,500.00 paid directly to Pacific Door and credited under Receipt No. 722754 in the above-referenced paragraph) plus the $4,100.00 Veterans Administration check (Plaintiffs' Exhibit "8"; Defendant's Exhibit "E-T"), and the original contract amount of $444,105.00, the sum is $511,800.00. The Court finds that the

1  total amount paid to Defendant according to Plaintiffs' Exhibit
2  "8" was $511,800.00 toward the completion of the project.

3         23.   Despite Plaintiffs' payment of the $511,800.00 to
4  Defendant to build the custom home, to date, Defendant admitted
5  that he failed to complete construction of the project and did
6  not obtain a certificate of occupancy from the County of Fresno.
7  The evidence before the Court was that Plaintiffs had on
8  numerous occasions requested an accounting and specific
9  itemization with receipts and invoices for the monies paid to
10 Defendant for the construction of the home.   Mr. Ford's
11 testimony is that the accounting was not provided.   Defendant,
12 on the other hand, indicated that his accounting was provided in
13 what are referred to as Defendant's Exhibits "A-7", "A-8" and
14 "A-9".   Exhibit "A-7" indicates that there was a total amount
15 due as of September 8, 2007 of $49,798.00.   The Court took
16 judicial notice of the Debtor's bankruptcy schedules that no
17 account receivable in that amount was scheduled.   The Court
18 finds that Defendant never provided Plaintiffs an appropriate
19 accounting.   Rather, Defendant simply submitted asserted
20 overages without proof, and unsigned change orders.

21        24.   Regarding Defendant's Exhibit "A-8", this
22 document is entitled a "Change Order for Custom Home page two".
23 There is an over-budget amount listed at $117,925.00.   It is
24 executed by Defendant, but not executed by Mr. Ford.   Mr. Ford's
25 testimony, which the Court finds is credible, was that he never
26 executed any change order document.   Defendant did not produce
27 into evidence any executed change order document.   The same
28 holds true with Defendant's Exhibit "A-9" dated September 13,

12

2007 showing upgrades/additions on contract of $118,975.00.  It states that the total of upgrades/changes was $73,187.00 or 16%. Again, this document is executed by the Defendant and not Mr. Ford.

25.  Defendant was the first witness called by Plaintiffs.  Defendant admitted knowing that it was unlawful to contract for work when his license was suspended.  He admitted to contracting without a license.  He also admitted that the Plaintiffs paid as required under the Contract and that the Contract contained an attorney fees clause.

26.  Plaintiffs entered into evidence Exhibit "5", a Certified Copy of a Second Amended Felony Complaint captioned: The People of the State of California vs. Shawn Deitz.  The Second Amended Felony Complaint was filed March 23, 2009 bearing Fresno County Superior Court Case No. F07908612 and DA File No. 2006Z44747.  There were five (5) counts set forth in the Second Amended Felony Complaint.  Mr. Ford testified the Second Amended Felony Complaint was filed after he and his wife initiated a complaint with the District Attorney's office.  Under Count Five (5) of the Second Amended Felony Complaint, Defendant was charged under Penal Code Section 487(a), that being the crime of grand theft of personal property for unlawfully taking money and personal property of a value exceeding $400.00 of Wayne Ford.

27.  This Court's Minutes of November 5, 2009 in this Adversary Proceeding indicate that the Adversary Proceeding was continued from time to time to allow the criminal matter to be tried.  It was ultimately tried in October 2010 before a jury. The victims in the complaint under Counts One (1), Three (3),

13

Four (4) and Five (5) were persons named Andrea C. Burnett, Herbert Milton Chartley, Michael Angelo Dejusto, and Wayne Ford respectively.  Ms. Burnett, Mr. Chartley and Mr. DeJusto were each scheduled in Defendant's bankruptcy schedules as general unsecured creditors and their claims discharged.  Ms. Burnett and Mr. Chartley will be discussed further below.  Count Two (2) was a misdemeanor count brought under California Business and Professions Code §7028 for contracting without a license on or about July 1, 2004.

28.  Following the criminal trial held in October 2010, the jury acquitted the Defendant on Counts One (1), Three (3), Four (4) and Five (5).  According to Defendant's testimony, the jury was polled and voted to acquit 11 to 1 on those counts.  The Court notes that the standard of proof in the criminal proceeding is "beyond a reasonable doubt".  Acquittal on those counts is not relevant to this Adversary Proceeding to determine dischargeability of a debt.

29.  As to the second count of contracting without a license, Defendant was convicted of contracting without a license in July 1, 2004 in violation of California Business and Professions Code §7028.  (Plaintiffs' Exhibit "6").  The Court finds this is relevant in light of Federal Rules of Evidence Rule 406 regarding the habit of a person.  In this case, the Court finds that the Defendant knowingly, and repeatedly, in contravention of California law, contracted to construct multiple projects while not possessing a contractor's license in good standing.

30.  The second witness called by Plaintiffs in the

14

case was John P. Thompson of Thompson Construction.  His Resume
was entered into evidence as Plaintiffs' Exhibit "10". He served
in the United States Navy and is a Viet Nam Veteran.   Mr.
Thompson obtained his General Building Contractor's License in
1979.   He  has worked in the construction industry for over 35
years.   His Resume indicates that he attained an Associate of
Arts Degree in Business Administration and transferred to San
Jose State University where he obtained a Bachelors of Science
Degree in Criminal Justice with a Minor in English.   In 1985 he
was hired by the CSLB in Northern California to participate in a
then new program called the Expert Witness Contractor Program.
He served for five (5) years as an expert witness for the CSLB.
Thereafter, he served for approximately 18 years as a senior
investigator for the CSLB. He also served as a Deputy Labor
Commissioner with the State of California Labor Commission
Office serving in the Fresno Office.  He retired from state
service in October 2010, renewing his contractor's license, and
currently works as an industry expert witness for the CSLB and
does contracting work on the side.

        31.  Mr. Thompson's Report of Inspection and Estimate
("Report") was received into evidence as Plaintiffs' Exhibit
"11".  Regarding his Report, Mr. Thompson testified that he
reviewed the Contract, and compiled the information contained in
the Report by personally inspecting the custom home project on
December 30, 2010.  Mr. Thompson found generally that the
construction performed by Defendant did not meet accepted trade
standards for good and workman-like construction in numerous
regards.  He took numerous pictures and provided an estimate for

the cost to complete/correct the work listed in the Report at
$238,950.00.  The cost includes labor, materials and services.
Page two of the Report indicates that Mr. Thompson had
personally performed and/or supervised over 100 projects similar
to the Ford project.  The Report lists the four (4) contracting
licenses that he possesses, those being a General Building and
Remodeling Contractor License, a C-15 Flooring Contracting
License, a C-33 Painting Contracting License and a C-54 Ceramic
Tile Contracting License.  On page three of Mr. Thompson's
Report, there is a statement that he prepared the Report based
on his knowledge, skill, experience and training in the fields
of general building and remodeling, flooring, painting and
ceramic tile. He further discloses that he would not enter into
any contract to perform the completion/correction of any work
which was the subject of his Report.  He certifies under penalty
of perjury that he does not personally know Plaintiffs and that
all statements, answers and representations in the Report,
including the attachments, are true and accurate.  Mr. Thompson
testified that he has appeared and testified in numerous
proceedings as an industry expert and on behalf of the CSLB.
The Court finds his testimony credible.

32.  Mr. Thompson lists 15 line item complaints in his
Report.  The first is that the appliances were not supplied and
installed.  The Report, Mr. Ford's testimony that the appliances
had been paid for but not installed with the exception of one
(1) double-oven, and Defendant's pictures received into evidence
support a finding that the majority of the appliances were not
installed.  Mr. Thompson's cost to correct or complete this item

16

is $9,245.00.   The testimony at trial was that the Plaintiffs
had paid for the appliances in the amount of $3,000.00 under the
initial bid (Plaintiffs' Exhibit "2") and an additional
$11,600.00 in June 2007 (Plaintiffs' Exhibit "3").   Thus, the
total amount paid for appliances that were not supplied was
$14,600.00.   The one caveat is that one appliance, a double
oven, was the only appliance installed.

         33.   The second item in Mr. Thompson's Report was that
the finish carpentry had not been completed.   He indicates that
the majority of the base boards had been installed but that the
gaps had not been filled and no painting had been done.   His
observations in the Report were that most of the interior door
openings had been finished with jambs and casings, however, the
nails were not set and filled, nor were the gaps filled or the
trims painted.   He testified that a number of doorways were also
out of square meaning significant work will be required to
correct these deficiencies so doors will properly fit, open, and
close.   He also noted in his Report that with the exception of
three doors that had been hung, there were a number of doors
stacked in the garage that were painted but severely damaged
needing to be replaced.   He states in his Report that the finish
carpentry was not completed to accepted trade standards and that
the cause of the defect was abandonment by the Defendant.   The
cost to correct this item is $12,900.00.

         34.   Regarding electrical work, a number of issues are
listed in the Report.   The Report indicates that the electrical
work was not completed to accepted trade standards, that certain
fixtures are not installed as called for under the plans, and

17

that the cause of the defect was abandonment and deviation from the approved plans.  The recommended method of correction is to troubleshoot the entire electrical system by tracing each individual circuit from the power supply source and "Ringing out the system."  His estimate to correct and complete the electrical items is $10,000.00.

35.  Item 4 in the Report regards two fireplaces. Although two gas fireplaces were installed, as indicated in photographs 14 and 20 of his Report, the grates, burners and valves remain in the cartons in which they were shipped and placed inside the fireplaces.  The exterior trim around the fireplaces, hearths, and mantles were not installed.  He indicates in the Report that Note No. 3 of the approved plans called for tight-fitting closeable glass or metal doors installed.  While glass doors were installed, he indicates in his Report that the outside air-intake and dampers were not installed, nor was the flue damper or control installed.  He again indicates that the complaint items fail to meet accepted trade standards with the cause of defect being abandonment, deviation from plans and specifications, and departure from acceptable trade standards.  The cost to resolve these problems is $3,100.00.

36.  Item 5 in his Report regards plumbing.  While the top-out rough plumbing was inspected and signed off by the County of Fresno on February 23, 2007, Mr. Thompson indicates that the tankless water heaters were set in place but not completed, having no water supply or return plumbing.  Item 5 of Plaintiffs' Exhibit "24", the Department of Veterans Affairs

18

Compliance Inspection Report dated March 5, 2008 prepared by
Paul Kennedy, the VA Building Inspector, further corroborates
that the water heater lacked venting and required a 3/4" copper
pressure relief valve. Mr. Thompson also states that the toilets
installed were not the brands selected by Plaintiffs and that
less expensive models or brands were utilized.  He further
indicates that the sinks and fixtures were not installed, and
the Court observed in Defendant's pictures, which Defendant
moved into evidence, that there were boxes of plumbing supplies
sitting in open cabinetry in at least one of the bathrooms of
the home.   The Report indicates that the fiberglass bathtubs had
been set on plywood frames and that despite the Contract with
the Plaintiffs for installation of cast iron tubs, the Defendant
deviated from the Contract and merely set in place, but did not
install, the fiberglass bathtubs.  Again, the cause of the
defect is Defendant's abandonment.  Mr. Thompson testified that
the cost to troubleshoot the plumbing system is a time-consuming
and costly venture.  His estimate to correct and/or complete the
plumbing issues is $30,000.00.  The Court also finds that
Defendant failed to pay Ferguson Enterprises, Inc. in an amount
of $1,585.14 which is evidenced by the Ferguson Enterprises,
Inc.'s Mechanic's Lien filed with the Fresno County Recorder's
Office on January 22, 2008 as Document No. 2008-0007896 in the
amount of $1,585.15.  (Plaintiffs' Exhibit "N".)  The Court
finds this Mechanic Lien to be damages attributable to
Defendant's conduct and that with interest allowed under
California Code of Civil Procedure §685.010(a), that interest
accrued at the rate of 10% up to the time of trial in the amount

19

of $504.24 and thus the total as of April 4, 2011 owing to
Ferguson Enterprises, Inc. on this Mechanic's Lien is $2,087.39.

37.    Item 6 of the Report involves cabinetry.    In the
Court's view, cabinetry is a significant item showing
Defendant's abandonment of the project.    The testimony in the
case by Mrs. Ford was that she had met with Defendant initially
regarding one type of cabinets.    The Defendant instructed her to
go to a website that had certain types of cabinetry.    Mrs. Ford
testified that she did as the Defendant instructed.    She went to
the appropriate website and decided on a Shaker-style cabinet,
downloaded pictures of the same, and met with Defendant at
Defendant's house to look at similar type cabinetry doors.
Defendant represented that he could and would build the
cabinetry.    Defendant did not dispute this testimony.    The
Defendant's own pictures show that in the kitchen and multiple
bathrooms, the cabinetry is far from complete.    Despite
Plaintiffs paying for the cabinetry, all that has been installed
are frames with no backing, shelves, holes for shelves to go on,
and no cabinet doors or drawers.    The cabinetry is far from
complete.    In Mr. Thompson's Report, the cause of the defect,
again, is abandonment and departure from trade standards.    The
Court finds abandonment is the cause of the cabinetry issues.
The method of correction in Mr. Thompson's Report is to remove
all temporary framing and build and install new cabinetry at a
cost of $38,950.00.    The Court also reviewed Defendant's Exhibit
"W" which is a construction bid dated May 14, 2008 from JCL
Construction ("JCL") to complete the work at Plaintiff's house.
JCL's bid to complete the house was $122,014.00.    However, in

the Court's view, the JCL bid is not as comprehensive as the

Thompson Report, as it fails to account for such items as the

appliances Plaintiffs paid for, does not account for counter-

tops in bathrooms and other areas besides the kitchen, only

contemplates 3,000 square feet of tile while Defendant testified

there is 3,600 square feet of tile, and in general, is less

comprehensive as the Report.  The JCL bid for cabinetry with

maple Shaker style cabinets, which the Court finds was the

agreed-upon type of cabinets between the parties, was

$36,000.00.  In addition, under the JCL bid the installation

cost for the cabinets is an additional $4,600.00, and the cost

to stain and finish the cabinets is $3,450.00 bringing the total

to $44,050.00.  The Court finds Mr. Thompson's cost to complete

and install the cabinetry in the amount of $38,950.00 is

credible.

          38.  Another significant item not completed and

totally absent in the home are the counter tops.  There was

testimony by Mrs. Ford, Mr. Ford, Mr. Thompson, and the

Defendant specifically regarding the counter tops.  The Court

finds the undisputed evidence is that the counter tops were to

be granite. Defendant's pictures in particular, as well as

Plaintiffs' pictures, are very representative of the way the

home sits today.  The Defendant's pictures show no granite

counter tops installed in the home.  Defendant testified that no

granite was ever delivered to the house.  He further testified

that he did not know where the granite was.  The allowance in

21

the October 6, 2006 Contract for tile[2]/counter tops was
$15,000.00.  While it is undisputed that Plaintiffs paid that
amount, there are no granite counter tops or back splashes in
the home.  According to Mr. Thompson's Report, and his
testimony, the cause of the defect was abandonment by Defendant,
the failure to appropriately prepare the substrate support for
the counter tops, and the failure to provide and install the
granite counter tops after the material was selected at DAL Tile
and paid for by Plaintiffs.  Mrs. Ford testified that when she
spoke with the representative at DAL Tile, he indicated that the
Defendant never paid any money toward the granite counter tops
and that the granite was put back into inventory for sale to
other customers.  Mr. Thompson's cost to complete this abandoned
item is $24,550.00.  This includes preparation of the substrate
structures so they will properly hold the weight of the granite
upon its installation.  The Court finds this to be a reasonable
cost to complete the counter tops.

        39.   The next item concerns the tile floors.  Tile
floors are very significant due to Mr. Ford's disability.  The
floors must be smooth so as not to constitute a safety hazard.
According to Defendant's testimony, there is approximately 3600
square feet of tile flooring that needed to be provided for the
home to accommodate Mr. Ford's needs.  Mr. Thompson observed in
his Report, and testified, that the tile floors were not

---

[2] Defendant's Exhibit "W", the JCL Construction Bid dated May 14, 2008,
includes $10,800 for standard grade granite and an additional $1,690.00
for kitchen tile back splash.  The Court finds the "tile/counter tops"
in Defendant's October 6, 2006 Contract was for tile back splash and
granite counter tops.

22

completed, that different dye lots and colors of tile were
installed, and that the tile that was installed was uneven and
cracked.  His observations were that the tile that was cracked
due to the slab foundation being incorrectly poured.  In his
Report, under item eight, Mr. Thompson notes that Note #12 of
the approved plans called for the slab foundation to be three
and one-half inches thick with a 6 x 6-pound 10X welded mesh
wire installed mid-point in the slab.  The Report indicates that
the Plaintiffs observed the pouring of the slab foundation and
no wire mesh was installed.  The Defendant did not rebut this
evidence.  Mr. Thompson's Report indicates that the failure to
follow the approved plans in the pouring of the slab foundation
was not within acceptable trade standards, and alone, was
sufficient to cause the severe cracking of the slab, which
ultimately contributes to the cracking of the tiles.  He further
observed that there was a significant problem with "lippage".
Lippage is the difference in height between the edge of one tile
and another adjacent tile.  Excessive lippage results in a trip
hazard, especially dangerous where someone is handicapped, as is
Mr. Ford.  Mr. Thompson testified that the industry standard for
tile lippage is 1/6".  The pictures accompanying his Report show
that the lippage between the tiles in some instances is 3/16" to
5/16".  He testified that this occurs throughout the home where
tiles were set.  Regarding the slab floor, Mr. Thompson
testified, and his Report indicates, it deviates from industry
accepted standards of a "plus or minus" of 1/4" over ten feet.
Some of his photos, for example, photos 24 and 25 to his Report,
show a severely cracked concrete slab floor which is the result

1 of no steel reinforcement in the concrete slab floor and 5/16"
2 displacement between the two cracked edges.  Photo number 26
3 shows the concrete slab floor is out of level 3/8" over six
4 feet.  Photo number 27 shows tile lippage of 3/16", while photo
5 number 28 shows cracked tile that has "telegraphed" from the
6 cracked concrete slab floor under the tile.

7         40.  The cause of the defect with respect to the
8 concrete slab floor was deviation from accepted trade standards.
9 Regarding the tiles, the Court finds that Defendant failed to
10 order all tiles at the same time so they would be matching and
11 from the same dye lot, and this in turn resulted in Defendant
12 being unable to install sufficient tile of a single dye lot to
13 complete the entire project.  Mrs. Ford testified that the
14 specific tiles selected had a slip resistance comparable to
15 commercial grades of tile especially selected due to her
16 husband's disability.  The tiles have now been discontinued,
17 thus making ordering additional matching tile impossible.
18 Defendant corroborated Mrs. Ford's testimony.  The Defendant did
19 offer, however, that he was able to find similar tiles and if
20 they were set in another room, one would not be able to tell the
21 color differentiation.  The Court finds Defendant deviated from
22 the plans and specifications by failing to install the wire mesh
23 in the foundation which resulted in excessive cracking of the
24 concrete slab foundation which then telegraphed into the tile
25 floors which caused excessive cracking of the tile floors.  The
26 Court further finds that Defendant failed to install the tile
27 flooring level between the tiles in conformity with trade
28 standards causing excessive and unsafe lippage.  The Court finds

24

this perhaps is the most costly item to complete.  As Mr.
Thompson testified, the best corrective action short of razing
the entire structure and removing and replacing the entire
foundation, would be to remove all of the tiles from the floor,
clean the floor of all thin-set adhesive, grind the exposed
cracks with a "B" diamond tool and fill the cracks with epoxy.
From there the floors must be floated out so they will be level,
and Plaintiffs will have to re-purchase and install new equal in
value 20" x 20" tiles and grout as required.  His estimate of
cost to fix this portion of the job is $60,350.00.

41.    Item No. 9 regards insufficient insulation in the
attic.  Mr. Thompson observed that the approved plans called for
blowing insulation under the work platform for the heating and
air conditioning unit in the attic.  His estimate to complete
the insulation installation was $1,600.00.  The rain gutters,
which were a $2,600.00 line item paid for in Plaintiffs' Exhibit
"3", were never installed.  Mr. Thompson's estimate to install
galvanized gutters and a new drip edge metal and down spouts is
$5,600.00.  On cross-examination he testified that the
difference in price from the $2,600.00 cost Defendant allocated
and Mr. Thompson's cost of $5,600.00 was because the roof tiles
would have to be lifted in order to place the drip edge and rain
gutters under the roof tiles and adhere them to the fascia
board.

42.    The next complaint was that there was debris left
on the roof and that the monetary cost to clean the debris from
the roof is $350.00.

43.    Mr. Thompson observed in his Report that one air

25

conditioning unit was missing as called for in the approved
plans.   The original plans called for three.   However, the
contract signed by the Plaintiffs only indicates two air
conditioning units.   The Defendant testified the two air
conditioning units would supply the same output as the three
called for under the approved plans. However, it is unclear as
to whether the output of the two installed air conditioning
units would equate to the same output as the three called for
under the plans.   What is clear and the Court so finds, is that
Defendant again deviated from the approved plans.   The Court
does note that on Exhibit "B" to Mr. Thompson's Report
(Plaintiffs' Exhibit "11"), that the refrigeration unit/furnace
required to be inspected and signed off by the County of Fresno
inspector, has not been signed at all.

44.   Item No. 13 in the Report regards the footing for
the columns that support the front portico.   The Report
indicates they are too small. There was no cost to complete that
deviation from the plans.   Item No. 14 in Mr. Thompson's Report
is a belly band on the exterior of the structure.   The plans
called for the belly band, which is a decorative feature, to be
installed around the entire structure.   It was only installed in
the front of the home.   The corrective measure to install the
belly band around the remaining three sides of the home would be
to install a foam belly band around those three exterior walls,
re-stucco them as required, and painting.   The cost to do that
would be $3,700.00.   The cause is again abandonment by
Defendant.

45.   The last item in the Report regards incomplete

26

1  painting.   Mr. Thompson's Report indicates that the industry
2  standard regarding painting is that painting of a completed home
3  is a final opportunity to enhance the workmanship of the
4  builder.   The Report states that the lack of paint, or "botched"
5  painting, tends to enhance the poor workmanship this contractor
6  performed on the job.   The cause of this defect as well as that
7  of the belly band, the footing for the columns that support the
8  front portico, and the air conditioning, the roof, rain gutters
9  and insulation in the attic are abandonment of the project.

10       46.   The total cost to complete the project, according
11  to Mr. Thompson's Report, is $238,950.00.   The Court finds this
12  cost to be realistic.

13       47.   Mr. Thompson also testified regarding his
14  investigation, as the senior investigator for the CSLB, of the
15  Andrea Burnett and Herbert M. Chartley jobs.   Defendant was the
16  contractor on these jobs.   Plaintiffs' Exhibit "12" has the CSLB
17  Licensee Investigation Reports that were assigned to Mr.
18  Thompson for investigation.   Mr. Thompson testified that he
19  prepared these reports in the ordinary course of business while
20  he was an investigator for the CSLB.   In each one of these
21  cases, similar problems existed.   For example, as Plaintiffs'
22  Exhibit "14" demonstrates, with respect to the Burnett property,
23  the Defendant contracted without a license, took a $15,000.00
24  check when he was supposed to be paid $1,500.00, cashed the same
25  claiming that it was a mistake, failed to exercise reasonable
26  diligence to complete the job, exceeded the contract amount for
27  the project as is the case herein, and then abandoned that job
28  as well.   With respect to the Chartley project, the Defendant

27

lacked reasonable diligence in building the project, departed
from accepted trade standards in the building that was done,
took monies in excess of the amount of the contract, required an
excessive down payment and ultimately abandoned the project.   In
the Burnett case, Mr. Thompson determined Ms. Burnett suffered
damages in the amount of $17,168.50.   (Plaintiffs' Exhibit "12",
CSLB Complaint No. NB2006-560 at paragraph 9 synopsis of section
violated.)   Mr. Chartley was also a disabled veteran.   CSLB
Complaint No. NA2005-327 regards the Chartley project, which is
Plaintiffs' Exhibit "13". The established injury to Mr. Chartley
was $22,671.84.

48.   The Court also notes that the CSLB on its own
behalf had assigned Mr. Thompson to file a complaint with the
District Attorney's office for numerous violations by the
Defendant.   Plaintiffs' Exhibit "14" shows a complaint by "L.
Registrar" with various Business Code violations including
abandonment of project, diversion of funds, willful and
fraudulent acts, contracting without a license and exceeding the
contract amount.   The Court finds that Defendant has exhibited
this type of conduct for a significant portion of his
contracting license history and with respect to Plaintiffs'
project, exhibited similar conduct.

49.   Terry Freeman also testified at the trial.   Terry
Freeman is the manager of Pacific Door.   Pacific Door supplied
the doors for Plaintiffs' home.   Mr. Freeman has worked at
Pacific Door for 23 years and held the position as manager for
20 years.   As the position of manager, he is familiar with the
books and records and intimately familiar with receivables due

28

1    to Pacific Door.  He also is familiar with the pre-liens and
2    mechanics liens filed by Pacific Door.

3            50.   Mr. Freeman testified that the contract amount
4    for doors for Plaintiffs' house was $22,508.26.  (Plaintiffs'
5    Exhibit "9").  He testified that the only monies paid to Pacific
6    Door by Defendant was $2,500.00.  He also testified that
7    Defendant did tender two other checks each in the amount of
8    $5,000.00 to Pacific Door.  However, those checks were non-
9    negotiable due to non-sufficient funds.  Pacific Door sent these
10   checks to the District Attorney for collection.  The Court finds
11   that Defendant failed to pay the contract balance due to Pacific
12   Door.  Pacific Door ultimately filed a state court action to
13   perfect its mechanic's lien under California law.  After
14   Plaintiffs paid $6,500.00 to Pacific Door, they were ultimately
15   able to settle the remaining balance after hiring another
16   attorney.  The case was then settled between the parties with
17   regard to the mechanic's lien filed by Pacific Door by paying an
18   additional $8,000.00.  As stated above, the Court notes that
19   Ferguson Enterprises, Inc. still retains an unsatisfied properly
20   perfected mechanic's lien due to Defendant's failure to pay for
21   plumbing supplies.  (Plaintiffs' Exhibit "9").  The Court
22   further notes that Defendant scheduled Pacific Door as a general
23   unsecured creditor in his Schedule "F" in the amount of
24   $12,505.00.  This corresponds to the Pacific Door Amended Claim
25   of Mechanic's lien in the amount of $12,505.26 filed against
26   Plaintiffs and included in Plaintiffs' Exhibit "9".

27           51.   Mr. Freeman further testified that prior to
28   Plaintiffs' project, he had two other dealings with the

                              29

Defendant.   Those cases regarded two homes in the Applegate
Project where Plaintiffs and Defendant first met.   Mr. Freeman
testified that Mr. Deitz never paid for doors he ordered for
those homes and that ultimately Pacific Door was forced to
collect from the owners of those homes as was the case herein.

52.   Mr. Ford testified next in this Adversary
Proceeding.   He testified about a number of items that have
previously been discussed.   Significantly, Mr. Ford compiled the
information set forth in Plaintiffs' Exhibit "7".   Plaintiffs'
Exhibit "7" concerns monies paid to Defendant while his
contractor's license was suspended.   The Court finds this amount
is $324,800.00.   Exhibit "7" is also supported by Exhibit "8"
which is Plaintiffs' compilation of all funds paid to Defendant.
It shows that Defendant was paid $511,800.00 as set forth which
includes $4,100.00 being paid directly to Defendant by the VA
for certain concrete work, and $6,500.00 paid on July 9, 2007
directly to Pacific Door by Plaintiffs which Defendant credited
Plaintiffs in Receipt No. 722754 in Plaintiffs' Exhibit "9".
Exhibit "9" is another compilation prepared by Mr. Ford, who
admittedly could not construct a house.   Exhibit "9" consists of
items that were paid for but Defendant failed to finish or needs
to be replaced or repaired with respect to the project.   The
total, as computed by Mr. Ford in Exhibit "9", is $154,307.48.
In support of Exhibits "7", "8" and "9", and included in
Plaintiffs' Exhibit "9", are fronts and backs of the negotiated
checks by Defendant and receipts issued by Defendant.   At the
time of trial, Plaintiffs' counsel and Mr. Ford randomly
selected checks and receipts from Exhibit "9" and matched the

30

same to checks set forth in Exhibits "7" and "8".

53.   The purpose of Plaintiffs' Exhibits "7", "8" and "9" is to establish Plaintiffs' injury and damages.  The Court finds that due to the Defendant's intentional and knowing false material misrepresentations upon which the Plaintiffs justifiably relied, that Plaintiffs were injured.  The Court further finds that Defendant's failure to exercise reasonable diligence in constructing the home, to build within accepted trade standards, and abandonment of the project proximately caused Plaintiffs' damages.  Plaintiffs offered Exhibits "7", "8" and "9" as evidence of the damages sustained by them at Defendant's hands.

54.   The Court finds that the evidence set forth in Exhibits "7", "8" and "9" is a true and accurate representation prepared by Mr. Ford of all monies paid to Defendant and that damages sustained by Plaintiffs may be computed from these exhibits, if necessary.

55.   Of particular note in this case are a number of emails set forth in Plaintiffs' Exhibit "17".  The email correspondence serves as a significant illustration of the problems experienced by Plaintiffs, and the communications between Plaintiffs and Defendant.  Some of the important emails in Plaintiffs' Exhibit "17" begin with an email dated January 7, 2008 from Defendant to Mr. Ford.  In that email, Defendant states that if he understood his paralegal correctly, they would get Plaintiffs dismissed from the Pacific Door mechanic's lien action based upon the fact that in the papers filed by Pacific Door it was a contract between Defendant's company and not the

31

Plaintiffs.    This is in absolute contradiction to the "Notice to Owner" set forth on page two of Plaintiffs' Exhibit "2" wherein Defendant specifically advised that if he failed to pay any supplier who helped to improve Plaintiffs' property, that the supplier has a right to place a lien on the home and sue the Plaintiffs in court to obtain payment.    The Court finds that as late as January 7, 2008, Defendant continued making knowing misrepresentations in contravention with his contract that he executed with Plaintiffs.    Defendant further indicates in that email that, "I don't see why you need a different attorney on the same case and I will pay for it."    This is significant in that there are additional damages in the form of attorney fees suffered by Plaintiffs due to Defendant's failure to pay suppliers.

56.    The Court also considered Defendant's December 27, 2007 email to Mr. Ford.    In that email he states that he paid over $7,000.00 to Pacific Door when Mr. Freeman testified that Defendant only paid them $2,500.00 of the contract balance. Defendant further states in that email that his license issue had been cleared and the record reflects in Plaintiffs' Exhibit "4" that Defendant's license was reinstated on December 27, 2007.    The Court finds that the representation of the payment to Pacific Door was yet another intentional misrepresentation made by Defendant to Plaintiffs.    In Defendant's October 12, 2007 email to Mr. Ford, he indicates that he would give a credit for the cabinets but wanted closure on the project so he could finish the house and move on.    He states that, "The more time we delay it keeps costing me both more time and money!"    He further

states that he had been honest with Plaintiffs since the beginning and was not sure where he had not been more clear on all of the Plaintiffs' budget and items that were added to improve the home.  The Court finds first, that Defendant had not been honest with the Plaintiffs since the beginning of the project.  Further, that the Defendant never provided an appropriate accounting of all costs and expenses incurred in the construction of the home.  This email tends to further discredit Defendant in the eyes of the Court and lends credence to the Defendant's pattern of conduct to abandon jobs prior to completion.  This email is also significant when compared to the September 8, 2007 email from Defendant to Mr. Ford.  On the second page of that email, the Defendant states:

> "I have budgeted the house very well and I'm not going to be left in the dust as with my Applegate projects. I was left with over $120,000.00 still left unpaid."

He also states further down in that email that:

> "I don't want you thinking I'm taking advantage of you any further.  We have had great communication up until the end of July and if I have led [sic.] you to believe in any way that I'm dishonest or have given you false information then we will clear it up.  All I have tried to do was build your home and give you what I want."

The Court finds that in the fall of 2007, after the home was supposed to have been completed, that Defendant was actively pursuing an exit strategy from the project without having completed the work contracted for.  These actions, in the Court's view, constitute a wilful act that is certainly designed to cause injury to Plaintiffs.  It was wrongful, intentional, the cause of Plaintiffs' injury and/or damages, and was done

33

without just cause or excuse.

57.    On August 15, 2007 Defendant emailed Mr. Ford indicating that they would be ready for inspection in about two or three weeks.  As set forth in the Thompson Report, the inspection card was never signed off for a Certificate of Occupancy and Defendant admitted on direct testimony that the home never received a final inspection and Certificate of Occupancy.  This again is simply another misrepresentation of material fact in this case.  In Defendant's August 5, 2007 email, Defendant states that he ordered 3,600 square feet of tile.  Defendant testified that DAL Tile told him he did not need to order all of the tile at once as it was readily available.  This is contrary to his August 5, 2007 email correspondence.  Defendant continues in his August 5, 2007 email that he was unsure how DAL Tile only ordered 1,000 square feet as the person at DAL Tile told him the same tile was readily available.  He professes to again have done his job.  He also acknowledges that the entry tiles needed repair and states that he would fix the entry tiles when he received more tiles. Defendant never fixed the tiles.  He also professes in his August 5, 2007 email that his contractor's license was in force. However, on August 5, 2007, Defendant's license remained suspended by reason of a judgment obtained in a court action bearing Case No. 06 CE SC 01566 from June 29, 2007. (Plaintiffs' Exhibit "4").  The license was not reinstated until September 4, 2007.  Accordingly, the Court finds that the Defendant's statements in the August 5, 2007 email are not credible and continue the pattern of intentional

34

misrepresentations in this case.

58.    The June 27, 2007 email from Defendant to Mr. Ford is also revealing.  It indicates that he received a telephone call from the appliance supplier and the appliances had arrived.  Although the appliances had already been paid for, Defendant states in that email that he will need to get $15,000.00 for the rest of the appliances when the appliances only cost $14,600.00 and were paid for with $3,000.00 under the original budget, and $11,600.00 on June 27, 2007.  (Plaintiffs' Exhibit "3").  Moreover, the testimony by Mr. Ford was that they had received numerous phone calls from the appliance supplier and despite the fact the appliances had been received, the Defendant never picked them up.  The Defendant, on the other hand, testified that he did not pick the appliances up because the house was not secure.  Mr. Ford testified that as the appliances were not picked up, his understanding was that the appliance dealer was levied upon by the Internal Revenue Service and the appliances were sold pursuant to that levy.  The Court finds that the Defendant's failure to pick the appliances up in a timely fashion directly resulted and proximately caused injury to Plaintiffs due to Defendant's inaction.  Additionally, the Court finds that this is simply another instance in which the Defendant, by failing to account, as he should have, to Plaintiffs for these appliances, as well as other items in the construction project, exhibits another action by Defendant to obtain money from Plaintiffs for which they had already paid.

59.    The Defendant's email of October 18, 2007 also indicates Defendant had enough money to pay the remaining

35

balance due to Pacific Door.  However, the evidence before the
Court is, and the Court finds, that the Defendant only paid
$2,500.00 to Pacific Door and this controverts his assertion of
having enough money to pay the remaining balance to Pacific
Door.  The Court finds it significant in that email of October
18, 2007 that Defendant stated:

> "When I issued a receipt for the doors didn't mean they
> were paid in full!! Never did I give you the impression
> that you paid me in full for those vendors.  Again, I
> didn't misuse your funds for your home in any way, shap
> [sic.] or form!"

The Court finds this assertion to be false and consistent with
Defendant's pattern of conduct in this case as well as the cases
of Chartley and Burnett.

> 60.  Exhibit "18" are the attorney fees of Scott C.
Hawkins incurred by Mr. Ford in defense of the Pacific Door
lawsuit.  Those attorney fees are in the amount of $5,670.00.
Exhibit "19" are the attorney fees incurred as of trial date by
Mr. Armstrong in representing Plaintiffs.  Those fees and costs
total $20,997.66.  Counsel was permitted to supply additional
documentation as to other fees and costs incurred.  Those fees
and costs include the time spent in trial and preparation of the
Proposed Findings of Fact and Conclusions of Law.  In total,
with the cost of Mr. Thompson's, the total fees and costs as of
May 6, 2011 are $50,501.43.

> 61.  Exhibit "20" references additional damages
suffered by Plaintiffs.  Those damages include estimates for the
attorney fees mentioned immediately above.  Plaintiffs request a
return of the $50,105.00 profit paid to Defendant.  They also
request damages of $1,755.75 per month for 45 months as of the

time of trial, or $79,008.75 for insurance, property taxes and payments on the first and second mortgage on the house that Plaintiffs would have sold back in 2007 had the project been timely completed. The Court finds that the Defendant abandoned or was fired and ordered not to return to the property in December 2007. In addition there was a  bid by JCL on May 14, 2008, to complete the new house,  which indicates that the relationship between Plaintiff and Defendant had terminated. The Court is aware of the Plaintiff's position that they did not have funds to complete the house even up to the time of trial. That is another issue not before the Court.  Those facts do not make those alleged damages "traceable to " and "resulting from" the Defendant's fraud.    Therefore the Court finds that the claimed damages in this category beginning in August 2007 and ending in April 2011 are NOT damages "resulting from " or traceable to" the fraud the Court has found. The Court will allow the sum of $19,313.25 covering the months April 2007 through June 2008.  Additional claimed damages by Plaintiff is for the loss of market value of Plaintiffs' current home.   In 2007 Mr. Ford testified they had listed their home for sale for $408,000.00 with the outstanding indebtedness of $325,000.00. The listing of a home does not establish value.   That home has certainly depreciated from 2007 but the testimony before the Court, consisting only of Mr Ford's statement, is not sufficient or convincing by the appropriate burden of proof to allow this court to allow this item.

## CONCLUSIONS OF LAW

62.   The burden of proof in nondischargeability cases

37

is by a preponderance of the evidence.  <u>Grogan v. Garner</u>, 498
U.S. 279, 289, 111 S. Ct. 654, 651, 112 L.Ed. 2d 775 (1991).

63.   This adversary proceeding alleges claims under 11
U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).

64.   11 U.S.C. §523(a)(2)(A) provides in pertinent
part that:

> "... a discharge under Section 727, ... does not
> discharge an individual debtor from any debt - ... (2)
> for money, property, services, or an extension,
> renewal, or refinancing of credit to the extent
> obtained, by - (A) false pretenses, false
> representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's
> financial condition;"

65.   To prove a debt non-dischargeable pursuant to 11
U.S.C. §523(a)(2)(A) a creditor must prove by a preponderance of
the evidence the following:

A.   The debtor made the representation;

B.   That at the time the representation was made, the
debtor knew it was false;

C.   That the debtor made the misrepresentation with
the intent and purpose of deceiving the creditor;

D.   That the creditor justifiably relied on the
representation; and

E.   The damages sustained as a result of the
misrepresentations were proximately caused by the debtor's
conduct.

See <u>In re Slyman</u>, 234 F.3d 1081, 1085 (9th Cir. 2000);
<u>In re Britton</u>, 950 F.2d 602, 604 (9th Cir. 1991); <u>In re Kirsh</u>,
973 F.2d 1454 (9th Cir. 1992); <u>In re Sabban</u>, 384 B.R. 1, (9th
Cir. B.A.P. 2008); <u>In re Martinez</u>, 49 Bankr. Ct Dc 173 (2008

38

Bankr. LEXIS 470) (C.D. Cal. 2008).

## THE DEBTOR KNOWINGLY MADE FALSE REPRESENTATIONS

66.   California Business and Professions Code Sections 7000, et seq., otherwise known as the Contractor's State License Law, requires contractors to be licensed at all times when they contract to perform construction work and while they are constructing works of improvement.   California Business and Professions Code Section 7028.5.

67.   California's strict statutory guidelines are designed in significant part to protect consumers from the perils incident to contracting with incompetent and unlicensed contractors.   In re Martinez, 49 Bankr. Ct. Dec. 173 (2008 Bankr. LEXIS 470) (CD Cal.2008) approvingly citing Davis Co. v. Superior Court of San Diego County, 1 Cal. App. 3d 156, 158, 81 Cal. Rptr. 453 (1969).   It is a misdemeanor for any person to engage in the business or act in the capacity of a contractor without having a license, with certain exceptions that are not applicable herein. California Business and Professions Code Section 7028.

68.   Court California Business and Professions Code Section 7031 prohibits unlicensed contractors from maintaining actions to recover compensation.  Additionally,  parties utilizing the services of unlicensed contractors may recover all compensation paid to the contractor even where the person for whom the work was performed knew that the contractor was unlicensed.   Please see Hydrotech Sys. Ltd. v. Oasis Water Park, 52 Cal.3d 988, 1007, 277 Cal. Rptr. 517, 803 P.2d 370, 376 (1991).

69.    Defendant was licensed as a general contractor September 10, 2004, but had at least nine (9) suspensions of his license due to various reasons.  He failed to disclose these suspensions to Plaintiffs as statutorily required.  California Business and Professions Code Section 7030.1(a)&(b).  He was convicted of contracting without a license previously, and admitted at trial that although he represented to Plaintiffs that his license issues were resolved and therefore in good standing as a contractor, he knew when he contracted with Plaintiffs that his license was not in effect.  Additionally, Defendant represented that he could and would complete the construction of the home to ADA, VA, County of Fresno building code requirements which he did not do.

70.    This case bears great similarity to what the creditors in In re Martinez, supra, experienced.    In this case, as in Martinez, the Defendant knowingly represented that he was a licensed contractor when he was not, received funds directly from Plaintiffs, and then failed to apply all of the funds so received for construction of Plaintiffs' home.  The evidence clearly and amply demonstrates Defendant failed to apply all of Plaintiffs'  funds to the project.

71.    The Court concludes that Defendant knowingly made a false representation that he was a licensed contractor in October 2006 when he contracted with Plaintiffs.  The evidence clearly  demonstrates that while Defendant had procured a bond and represented to Plaintiffs that his contractor's license was then in good standing, his contractor's license was not reinstated until January 3, 2007 due to being suspended for an

40

adverse judgment.  Thus, his license was not in effect until approximately two months after contracting with Plaintiffs. Defendant admitted at trial he knew the representations were false when they were made to the Plaintiffs.  Defendant was also convicted of the crime of contracting without a license previously, and admitted at trial that he knew he contracted with Plaintiffs when his license was not in effect. Additionally, the Defendant previously represented that he would complete the construction of the home to ADA, Val and the County of Fresno building code standards.

72.  Accordingly, the Court concludes that Defendant knowingly made material false representations to Plaintiffs about
the status of his contractor's license and his ability to construct the home which Plaintiffs hired him to build.

**DEFENDANT'S MISREPRESENTATIONS WERE INTENTIONAL AND MADE TO DECEIVE PLAINTIFFS**

73.  Intent to deceive may be inferred from the facts set forth in the case.  In re Rubin, 875 F.2d 755 (9th Cir. 1989).  Defendant's misrepresentations were intentional and designed specifically to deceive and induce Plaintiffs for the sole purpose of being retained to build Plaintiffs' home and profit thereby.

74.  Plaintiffs testified that they believed Defendant's license issues were resolved upon his obtaining the contractor's bond to which both Plaintiffs and Defendant testified.  In fact, Defendant was convicted of a misdemeanor in the Fresno County Superior Court of contracting without a

license in July 1, 2004, pursuant to California Business and
Professions Code Section 7028.  Defendant's Contractor's Licence
history (Plaintiffs' Exhibit "4"), shows numerous suspensions
resulting from judgments and lack of bonding.  Evidence of the
habit of a person or of a routine of practice is relevant to
prove that the conduct of the person on a particular occasion
was in conformity with their habit or routine practice.  Federal
Rules of Evidence Rule 406.  The Court may only conclude from
the evidence presented, that as early as July 1, 2004 and
continuing up to and through the time when Defendant contracted
with Plaintiffs, that he had intentionally acted on numerous
occasions to contract to build in the State of California while
his license was suspended.  The evidence also shows he abandoned
or, failed to complete, at least two (2) other construction
jobs.  Thus, the Court may only infer and conclude, based upon
these circumstances, the testimony, and documentary evidence
before the Court, that Defendant acted with the intent to
deceive Plaintiffs.

**PLAINTIFFS JUSTIFIABLY RELIED UPON DEFENDANT'S**

**MISREPRESENTATIONS**

75.   Justifiable reliance is the standard that must be
proven in complaints objecting to the dischargeability of
particular debts under 11 U.S.C. §523(a)(2)(A).  Field v. Mans,
516 U.S. 59, 71, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).
"Justification is a matter of the qualities and characteristics
of the particular plaintiff, and circumstances of the particular
case rather than of the application of the community standard of
conduct to all cases."  Field v. Mans, supra, 516 U.S. at 71

42

citing <u>Restatement Second of Torts</u> §540 (1976).  Defendant
knowingly and repeatedly, in contravention of California law,
contracted to construct multiple projects while not possessing a
contractor's license in good standing.  See Paragraph 29 above.
"A person is justified in relying on a representation of fact
'although he might have ascertained the falsity of the
representation had he made an investigation.'"  <u>Field v. Mans</u>,
<u>supra</u>, 516 U.S. at 70.  The Court concludes that the appropriate
standard is a "subjective standard", and whether the reliance
was justifiable under the circumstances in this case.  See also
<u>In re Martinez</u>, <u>supra</u>.

76.   The Ninth Circuit holds that to determine
"justifiable reliance", the court must look to all of the
circumstances surrounding the particular transaction, and must
necessarily consider the subjective effect upon the creditor.
<u>In re Kirsh</u>, 973 F.2d 1454, 1460 (9th Cir. 1992); see also <u>In re</u>
<u>Martinez</u>, <u>supra</u>.

77.   In this case, the Defendant exploited the
commonality between himself and the Plaintiffs to gain their
trust.  He utilized his military career and position as a
pharmacy tech at the VA Hospital where Mr. Ford receives
treatment to promote a common bond with Mr. Ford.  He utilized
the fact that his mother is a registered nurse to promote
commonality with Mrs. Ford.  He was forthcoming about the need
to first acquire a bond to reinstate his contractor's license,
which he then represented he acquired before contracting and
that his license was then in good standing when it was not.  He
also represented that he was knowledgeable regarding VA and ADA

43

building requirements for handicapped persons, and the County of
Fresno building code.  Additionally, Mr. Ford testified that
Defendant had cured his license issues and that Plaintiff's had
only one (1) prior experience with a contractor in Prescott,
Arizona and that remodel job went well.  As Judge Naugle held in
In re Martinez, supra, citing the Restatement Second of Torts
§540 (1976):

> "A person is justified in relying on a representation of
> fact although he might have ascertained the falsity of the
> representation had he made an investigation."

The Court concludes that Plaintiffs were not obliged to
investigate Defendant's contractor's license history prior to
executing the Contract.

78.  When the Court considers these facts and
circumstances, the Court may only conclude that Plaintiffs'
reliance was justifiable.

### PLAINTIFFS' DAMAGES WERE PROXIMATELY CAUSED BY DEFENDANT'S INTENTIONAL MISREPRESENTATIONS

79.  Proximate causation,

> "Is sometimes said to depend on whether the conduct
> has been so significant and important a cause that the
> defendant should be legally responsible.  But both
> significance and importance turn upon conclusions in
> terms of legal policy, so that they depend on whether
> the policy of the law will extend the responsibility
> for the conduct to the consequences which have in fact
> occurred."

In re Britton, 950 F.2d 602, 604 (9th Cir. 1991); In re Martinez,
supra, approvingly citing W. Page Keeton et al., Prosser and
Keeton on The Law of Torts, §42 at 273 (5th Ed. 1984).

80.  The damages incurred by Plaintiffs are equally a
foreseeable consequence of being defrauded by Defendant just as

44

much as the damages were in <u>Britton</u>, <u>supra</u>, and <u>Martinez</u>, <u>supra</u>.
Defendant's intentional misrepresentations discussed above
provide a firm foundation from which the many damages discussed
below occurred and ultimately harmed Plaintiffs.  Additionally,
the California Business and Professions Code referred to above
express a policy that consumers and citizens in the State of
California be protected from the perils of contracting with
incompetent and unlicensed contractors.  <u>Davis Co. V. Superior</u>
<u>Court of San Diego County</u>, <u>supra</u>, 1 Cal. App. at 158.

## 11 U.S.C. §523(a)(4)

81.    The second cause of action in Plaintiffs'
Adversary Complaint is for embezzlement.  Under Federal law,
embezzlement has been defined as "the fraudulent appropriation
of property by a person to whom such property has been entrusted
or into whose hands it has lawfully come."  <u>In re Littleton</u>, 942
F.2d 551, 555 (9th Cir. 1991) citing <u>Moore v. United States</u>, 160
U.S.268, 269 (1885).

82.    To prove embezzlement requires the showing of
three elements: (1) property rightfully in the possession of a
non-owner; (2) the non-owner's appropriation of the property to
a use other than which it was entrusted; and (3) circumstances
indicating fraud."  <u>In re Littleton</u>, <u>supra</u>.

83.    The evidence clearly shows that Defendant was
given significant monies and was rightfully in the possession of
those funds for a particular purpose, the building of
Plaintiffs' home.   Defendant failed to utilize these funds to
build and complete Plaintiffs' home for which these monies were
entrusted.  As stated above, Defendant's conduct clearly

indicates fraud.  Plaintiffs have proven embezzlement as
contemplated under 11 U.S.C. §523(a)(4).

84.  The Court makes no finding that Larceny exists in
this case.

## 11 U.S.C. §523(a)(6)

85.  Section 523(a)(6) in part provides that a
discharge under Section 727 does not discharge an individual
debtor from any debt for willful and malicious injuries.

86.  According to the United States Supreme Court, the
willful requirement of Section 523(a)(6) "modifies the word
injury, indicating that nondischargeability takes a deliberate
or intentional *injury,* not merely a deliberate or intentional
act that leads to injury."  <u>Kawaauhau v. Geiger</u>, 523 U.S. 57,
61, 118 S. Ct. 974, 977, 140 L.Ed.2d 90, 95 (1998).  See also
Ormsby v. First American, 591 F.3d 1199 (9th Cir. 2010)

87.  Plaintiffs must prove the "willful injury"
requirement under 11 U.S.C. Section 523 (a)(6) by demonstrating
that the Debtor either had a <u>subjective motive</u> to inflict the
injury, or <u>believed the injury was substantially certain to
occur</u> as a result of the Debtor's conduct.  <u>In re Jercich</u>, 238
F.3d 1202, 1208, (9th Cir. 2001).  The Court concludes that both
situations exist.

88.  The requirement of "malicious injury" is separate
from the requirement of "willful".  <u>In re Su</u>, 290 F.3d 1140,
1146, (9th Cir. 2002.)

89.  A malicious injury requires (1) a wrongful act,
(2) done intentionally, (3) which necessarily causes injury, and
(4) is done without just cause or excuse.  <u>In re Bammer</u>, 131

46

F.3d 788, 791 (9th Cir. 1997) (en banc).

90.   Under California Civil Code Section 1572, a party to a contract with the intent to deceive another party to the contract, or to induce the other party to enter into the contract, acts with malice causing injury.   <u>In re Martinez</u>, <u>supra</u>.

91.   The Court concludes that Defendant fraudulently induced Plaintiffs to enter into the Contract at a time when he knew he was not licensed.   Based upon his prior acts, as the Court notes above, the Defendant had to have believed that injury to the Plaintiffs was substantially likely to occur based upon his actions and/or inaction.   Defendant further deceived Plaintiffs into making progress payments with continued misrepresentations about the status of the work on Plaintiffs' home and did so for his own gain to obtain funds from Plaintiffs.   This evidences a "subjective motive" by Defendant certain to inflict injury.   The funds that Plaintiffs provided to Defendant were substantial and the injury that was caused was certainly foreseeable.   The Court concludes that the malicious prong as set forth in <u>In re Jercich</u>, <u>supra</u>, is satisfied. Additionally, the Court concludes based upon the later emails between the parties, that Defendant was seeking an exit strategy without intending to complete construction of the home as agreed upon in the Contract between Plaintiffs and Defendant.   These acts constitute a willful and malicious injury pursuant to 11 U.S.C. Section 523(a)(6).

**DAMAGES**

92.   The Court concludes that  sum of the damages

47

suffered by Plaintiffs in this case were foreseeable and
substantial under each theory pleaded, except larceny in
Plaintiffs' Adversary Complaint and arose from Defendant's
fraud.   The United States Supreme Court holds that damages
"resulting from" or "traceable to" fraud are barred from
discharge.   <u>Field v. Mans</u>, 516 U.S. 59, 61, 116 S. Ct. 437, 133
L. Ed. 2d 351 (1995); accord <u>Cohen v. De La Cruz</u>, 523 U.S. 213,
218, 118 S. Ct. 1212, 140 L.Ed. 2d 341 (1998); <u>In Re Sabban</u>,
<u>supra</u>, 384 B.R. at 6-7.   First, the Court discusses the actual
damages sustained by Plaintiffs.   There are several
considerations in this regard.

    93.   Plaintiffs' complaint prays for damages in an
amount of <u>at least</u> $154,307.48.   (See also Plaintiffs' Exhibit
9, Page 1).   This amount was computed by Mr. Ford who testified
that he has no experience in construction.   Plaintiffs also
request in the Adversary Complaint that the Court order the
return of Defendant's profit in the amount of $50,105.00 as
Defendant failed to complete the construction and ultimately
abandoned the project.

    94.   The Court concludes that while Mr. Ford
diligently attempted to quantify the damages, the evidence is
that Plaintiffs' damages far exceed his estimate.   Plaintiffs'
estimate fails to account for removal and replacement of the
substantial tile flooring.   It fails to account for the cost to
repair the foundation, electrical and plumbing issues.   It also
fails to account for a number of other items as set forth in
significant detail in Mr. Thompson's Report including the
cabinetry.

95.   Plaintiffs also offer Exhibit "7" which sets forth all monies paid to Defendant while his contractor's license was suspended.  This amount is $324,800.00.  Under California law, Plaintiffs may recover the total of these funds. Business and Professions Code Section 7031(b).

96.   While the Court concurs with Judge Pappas' dissent in In re Sabban, 384 B.R. 1 (9th Cir. B.A.P. 2008) that Defendant should disgorge all payments made to him while he contracted without a valid license as contemplated under California Business and Professions Code §7031(b) as they were made due to Defendant's fraud, the Court feels constrained to follow the majority opinion in that Bankruptcy Appellate Panel decision and cannot utilize this as a measure of damages.

97.   Damages are also set forth in the JCL Construction bid of May 14, 2008.  (Defendant's Exhibit "W"). The amount set forth in this bid is $122,014.50.  There are several caveats at the conclusion of the bid.  There is the likelihood for at least a 10% overage on the quoted price due to the fact that other items are likely to be discovered as the project is being finished.  Additionally, it fails to account for the appliances Plaintiffs' paid for that were not installed. It fails to provide for bathroom counter tops and back splashes. It also only contemplates replacement of 3,000 square feet of tile as opposed to 3,600 which Defendant testified was required. This bid, in the Court's view, however, is not as comprehensive as Mr. Thompson's Report.

98.   Mr. Thompson's Report is quite comprehensive and prepared by Mr. Thompson who has significant experience as a

49

1  contractor and as a Senior Investigator for the CSLB.  In the
2  performance of his duties as a Senior Investigator with the
3  CSLB, he calculated damages sustained by parties in regards to
4  various construction projects.

5       99.  Mr. Thompson's Report calculates damages
6  sustained by Plaintiffs at $238,500.00, which the Court
7  concludes is credible.  The Court believes the deficiencies
8  needing correction and completion will easily cost this much.

9       100. Secondarily, there are additional consequential
10  and compensatory damages suffered by Plaintiffs "traceable to"
11  and "resulting from" Defendant's fraud. These damages include
12  the damages resulting from Defendant's failure to pay certain
13  suppliers.  The evidence before the Court is that after
14  Plaintiffs paid Defendant for their doors, Defendant did not pay
15  Pacific Door.  Plaintiffs' then paid Pacific Door $6,500.00 on
16  July 9, 2007 (Plaintiffs' Exhibit "8") and according to Mr.
17  Ford's testimony, an additional $8,000.00 to settle the mechanic
18  lien litigation.  There also is the remaining Ferguson
19  Enterprises, Inc.  mechanic's lien in the amount of $1,584.14 as
20  of trial, and now calculated by the Court to be $2,087.39.

21       101. Additional consequential and compensatory damages
22  "traceable to" and "resulting from" Defendant's fraud include
23  the payment by Plaintiffs of  $5,670.00 in attorney fees
24  incurred by Scott C. Hawkins to defend the Pacific Door mechanic
25  lien litigation.  (Plaintiffs' Exhibit "18").

26       102. Exhibit "20" alleges that they are entitled to
27  other consequential and compensatory damages suffered by
28  Plaintiffs "traceable to" and "resulting from" Defendant's

fraud.    These damages are the $50,105.00 in profit paid to Defendant for a construction project he abandone and 45 months of payments of insurance, property taxes and payments on the first and second mortgage on Plaintiffs' current home that they would have sold in 2007 had the project been timely completed in the amount of $79,008.75 (Plaintiffs' Exhibit "20"). The Court is allowing as damages the $50,105.00 in profit paid to Defendant.    The Court is only allowing 11 months of payments for insurance, property taxes, and mortgage payments for a total of $19.313.25 for the reasons set forth in paragraph 61 above.    Ex "20" is also claiming $60,000 for loss of value in their home over the years.    The Court is not allowing any damages for the claimed loss of value of Plaintiffs current home as explained above in paragraph #61 for the reason that there was no credible and /or sufficient proof offered to support the claim.

103. Lastly, there are the attorney fees and costs including experts of $55,917.12 (see the supplemental declaration filed by Armstong ) "resulting from" and "traceable to" Defendant's fraud.    Defendant's contract includes an attorney fee clause and under California Civil Code Section 1717, prevailing parties are entitled to recover attorney fees and costs.    The Supreme Court holds that prevailing parties may recover such damages.    <u>Travelers Casualty and Surety Company of America v. Pacific Gas & Electric Co.</u>, 549 U.S. 443, 127 S. Ct. 1199, 1203, 167 L.Ed.2d 178 (2007).

104. The Court concludes that damages in this case directly "resulting from" and "traceable to" the Defendant's fraud are as follows:

51

|   |    |                                      |              |
|---|----|--------------------------------------|--------------|
| A. | Cost of Repair and Completion:      | $238,500.00  |
| B. | Mechanic Lien Issues:               | 16,587.39    |
| C. | Mechanic Lien Attorney Fees:        | 5,670.00     |
| D. | Return of Profit:                   | 50,105.00    |
| E. | Insurance, Property Taxes and       |              |
|    | House Payments:                     | 19,313.25    |
| F. | Attorney Fees, Costs, Experts       | 55,917.12    |
|    | Total Damages                       | $386,092.76  |

105. The Court concludes that but for Defendant's fraud, embezzlement, larceny, and willful and malicious conduct, that Plaintiffs would not have suffered these damages. Therefore, the Court concludes as a matter of law that the amount of $386,092.76 is nondischargeable pursuant to 11 U.S.C. §§523(a)(2)(A), (4), and (6).

Dated: July 28, 2011

Richard T. Ford, United
States Bankruptcy Judge

52